# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

ABUBAKAR SAKAPALA and
ALICK BANDA

CRIMINAL CASE NO.

3:18-cr-00008-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Abubakar Sakapala ("Sakapala") and Alick Banda ("Banda"), jointly referred to as "defendants," are charged in a two-count indictment with conspiring to possess with the intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and possessing with the intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A) and 18 U.S.C. § 2. [Doc. 15].[1] Both defendants have moved to suppress evidence and statements obtained following a stop of the tractor trailer in which they were traveling on March 13, 2018, [Docs. 33, 34, 35, & 36], and Banda filed a supplemental brief in support of his motion to suppress evidence, [Doc. 42].

---

[1] The indictment also contains a forfeiture provision. See [Doc. 15 at 2-3]. The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

Following an evidentiary hearing,[2] the parties filed post-hearing briefs on the motions.   [Docs. 51, 57, 58, & 62].[3]   For the reasons that follow, it is **RECOMMENDED** that defendants' motions to suppress evidence and statements, [Docs. 33, 34, 35, & 36], be **DENIED**.

## I.  STATEMENT OF FACTS

In December of 2017, agents of the Drug Enforcement Administration ("DEA") received information from a confidential source ("CS") that an individual identified as Amani Sanga, whom the CS called "Andrew," was "involved in narcotics trafficking" using tractor trailers with "traps, typically along the front wall," to transport narcotics from California and Texas to Atlanta, Georgia.  (Tr. at 13, 34-35, 64, 69-71).[4]   After receiving this information, DEA agents performed

---

[2] See [Doc. 47] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)," cited according to the transcript page number shown on the upper right corner.  In addition, the government submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. __)."

[3] Sakapala has also moved to adopt Banda's reply to the government's consolidated response.  See [Doc. 61].  Sakapala's motion, [Doc. 61], is hereby **GRANTED** as unopposed, and the Court will consider the arguments raised in Banda's reply as they apply to Sakapala.

[4] The CS, who was within Andrew's inner circle, explained that if the tractor trailer was coming from California, Andrew was usually transporting cocaine, heroin, and/or methamphetamine, but if it was coming from Texas, he was usually transporting cocaine and/or heroin.  (Tr. at 13, 35).

database checks and discovered that Andrew, who was associated with an address in Katy, Texas, was the subject of a prior DEA investigation in Atlanta, in which he had been identified as an individual "transporting narcotics throughout the country via tractor trailer." (Tr. at 13, 70). After receiving the information from the CS and reviewing the information in the database that corroborated the CS's information, DEA agents sought and obtained a geo-location warrant for Andrew's phone. (Tr. at 13, 36-37, 71, 73-74).

The CS subsequently advised DEA agents that a load of narcotics would be coming to Atlanta from California, and on February 10, 2018, geo-location data from Andrew's phone showed that he was at the Los Angeles International Airport, and about four hours later, that he was in Atlanta. (Tr. at 14, 95). On February 13, 2018, agents established surveillance at an apartment complex believed to be the location where Andrew resided while in Atlanta, and at approximately 1:00 a.m., geo-location data placed Andrew's phone in the vicinity of the apartment complex. (Tr. at 14). An agent positioned within a garage at the apartment complex observed a vehicle arrive driven by either a white or Hispanic male, who remained seated in the vehicle for about 45 minutes until a black male walked out of an apartment building and entered the vehicle. (Tr. at 14-15). Shortly thereafter, the vehicle departed the apartment complex and the geo-location data no longer placed Andrew's phone

near the apartment complex, leading the agents to believe that Andrew was one of the men in the vehicle.  (Tr. at 15).  Based on information provided by the CS that Andrew possibly used a warehouse near the Patterson Avenue area to unload the tractor trailers when they arrived in Atlanta, the agents traveled to that area to conduct surveillance.[5]  (Tr. at 15, 37-38).  As agents were crossing over Patterson Avenue from East Ponce De Leon Avenue, they observed a tractor trailer stuck in the middle of the road.  (Tr. at 15, 39).  The white tractor had a "Venture Logistics" marking on the side.  (Id.).  At this time, geo-location data placed Andrew's phone near the warehouse at Patterson Avenue, and when agents arrived at the warehouse, they observed the vehicle that had earlier been at the apartment complex, as well as two black males, one of whom resembled Andrew.  (Tr. at 15).  Later, the tractor trailer that had been stuck in the road was observed at the warehouse, and agents saw the man they believed to be Andrew detach the tractor from the trailer, and a driver entered the tractor and drove away from the warehouse, leaving the trailer behind.  (Tr. at 16).

Agents maintained their surveillance of the trailer at the warehouse and observed "a lot of traffic around the warehouse" and later saw Andrew leave the

_____

[5] The warehouse was "not a warehouse where trucks offload cargo," since it did not have "any loading docks per the normal warehouse where trucks back into," but was "just a building that [the agents] reference[d] as a warehouse because of the nature of the building."  (Tr. at 38).

warehouse, but then geo-location data revealed that he subsequently returned to the area, and he was observed sitting alone in a vehicle at a gas station away from the warehouse.  (Id.).  As some of the agents maintained surveillance on the warehouse, it "became clear to [them] that something was wrong, because there was movement at the warehouse but they weren't doing anything" and the agents concluded that their surveillance had been detected.  (Tr. at 17, 41-42).  The agents terminated surveillance between 11:30 and 11:45 p.m., and around 12:20 or 12:25 a.m. on February 14, 2018, geo-location data placed Andrew's phone back at the warehouse, where it remained for about three hours.  (Id.).  Agents did not observe what transpired at the warehouse during this time, but believed that Andrew or others unloaded the trailer.  (Tr. at 17, 42).  After the trailer left the warehouse on February 14, 2018, geo-location data placed Andrew's phone back in California.  (Tr. at 18).[6]

On February 18, 2018, a license plate reader captured the tag on Andrew's trailer, traveling west on Interstate 40 through Holbrook, Arizona, which was a couple of hours away from the Los Angeles, California area.  (Id.).  A few days later, geo-location data showed Andrew's phone had traveled from California back to

_____

[6] The following day, agents identified the trailer as being registered to Royal Trucking, which was owned by Andrew Sanga, at the same address in Katy, Texas, associated with Andrew.  (Tr. at 13, 17, 39, 75).  Agents also determined that two tractors were registered to Royal Trucking, but that the white tractor with the "Venture Logistics" marking was not registered to Royal Trucking.  (Tr. at 40).

Atlanta, and a license plate reader showed Andrew's trailer traveling east on Interstate 40 through Holbrook, Arizona, toward Atlanta.  (Id.).[7]  On February 27, 2018, agents established surveillance at the Patterson Avenue warehouse and observed the white tractor with the "Venture Logistics" markings and Andrew's trailer attached to it parked alongside the warehouse as it had been the first time the agents saw it.  (Tr. at 18, 44).

Later that night, geo-location data placed Andrew's phone near the warehouse, and a few hours later, agents saw a second tractor trailer, later identified as being registered to Jordan Garcia, back in alongside of the warehouse.  (Tr. at 19, 47).  A black pick-up truck pulled in behind the second tractor trailer, and an unidentified male carried a ladder from the warehouse into the back of Andrew's trailer.  (Tr. at 19).  About ten minutes later, agents observed the same male bring the ladder out of the trailer, along with "suitcase-size items" that were placed in the back of the pick-up truck, leading the agents to believe that there was "a wall in the[ trailer] protecting the drugs."  (Tr. at 19, 45, 59-60, 77-78).  The agents then observed similar activity take place with regard to the second tractor trailer and subsequently saw the second tractor trailer, as well as the pick-up truck, leave the warehouse.  (Tr. at 19-20, 45, 47).

_____

[7] The CS had advised the agents that possibly "two trucks" would be coming to Atlanta.  (Tr. at 95).

6

Thereafter, agents "received a court-authorized tracker to place onto [Andrew's] trailer," and they maintained surveillance on the trailer, which was still at the warehouse, in order to install the tracker. (Tr. at 19-20). When Andrew's trailer left the warehouse, agents followed it to a Pilot gas station in the area of Bouldercrest and Interstate 285, where they were able to install the tracker on the trailer. (Tr. at 20, 43-44, 49). Once installed, the tracker showed that Andrew's trailer traveled westbound on Interstate 20 until it arrived in McKinney, Texas, the following morning, February 28, 2018, and that it stayed there until the morning of March 1, 2018, when it continued on to an area near the West Houston airport in Houston, Texas. (Tr. at 20-21, 48-49). Similarly, geo-location data from Andrew's phone showed that on March 1, 2018, his phone traveled from Atlanta to Houston and ultimately to the area near the West Houston airport. (Tr. at 21, 50).

On the following day, March 2, 2018, geo-location data placed Andrew's phone at a warehouse near the West Houston airport, where it remained for about three hours, and then on March 3, 2018, geo-location data placed Andrew's phone back at the Houston warehouse, but the battery in the trailer tracker died that day. (Tr. at 21). On March 4, 2018, at approximately 6:00 a.m., geo-location data placed Andrew's phone at the Hobby Airport in Houston, Texas, and about two and a half to three hours later, the data placed his phone in Atlanta and subsequently at the

apartment complex where agents believed he stayed when in Atlanta, and it remained there until about 7:30 p.m. (Tr. at 21-22). Approximately 30 minutes later, geo-location data placed Andrew's phone at the Patterson Avenue warehouse, and agents arrived at that location between 9:00 and 9:20 p.m., at which time it was dark and they could not see the tag to confirm it was Andrew's trailer, but they believed it was his trailer based on the large dog emblem on the left-hand lower side of the trailer. (Tr. at 22). Shortly thereafter, agents observed a white tractor drive down Patterson Avenue and connect to Andrew's trailer, and once the trailer began moving, the agents were able to observe the tag and confirmed that it was Andrew's trailer. (Tr. at 22-23).

On March 5, 2018, agents maintained surveillance at the Patterson Avenue warehouse and observed Andrew's trailer and the same black pick-up truck previously seen at the warehouse on February 27, 2018. (Tr. at 23). They also observed someone take a ladder into a different trailer parked at the warehouse, but they could not see what took place inside that trailer, except that feet were moving along the bottom of the trailer. (Id.). The agents did not observe Andrew's trailer being unloaded on this day, and the tractor trailer subsequently left and traveled to an apartment complex, where agents were able to replace the dead tracker with a new one, and the tractor trailer remained there until the early morning hours of

March 7, 2018.  (Tr. at 23-24, 53).  Thereafter, the tractor trailer traveled to the Thornton Road area, where it stayed for about four hours, and agents observed that it was hooked up to a red tractor, which was registered to Radiant Logistics, a company registered to Amani Sanga, Andrew's legal name.  (Tr. at 24, 40-41).[8]  The tracker data showed that Andrew's trailer traveled from the Thornton Road area back to the warehouse near the West Houston airport in Texas on March 7, 2018.  (Tr. at 24).  On March 8, 2018, geo-location data showed Andrew's phone traveled to Houston and was in the same area where the tracker placed Andrew's trailer, and it showed the same activity on March 11, 2018, with the trailer remaining at the Houston warehouse until March 12, 2018.  (Tr. at 24-25).

On March 12, 2018, tracker data showed that between noon and 12:30 p.m., Andrew's trailer had moved about ten miles from the West Houston airport area to the Sam's Club on Katy Freeway near Andrew's Katy, Texas address, where it remained for about two hours before it began traveling east on Interstate 10 toward Atlanta.  (Tr. at 25, 50).[9]  Agents estimated that Andrew's trailer would arrive at the Georgia state line around 3:00 to 3:30 a.m. on March 13, 2018, assuming there were

---

[8] Andrew was stopped by the police on March 5, 2018, in the red tractor, but the trailer was not attached, and the tractor was subsequently searched, but the officers did not locate any contraband in the tractor.  (Tr. at 79-80, 95).

[9] Geo-location data also placed Andrew's phone near this location.  (Tr. at 25).

no stops.  (Tr. at 25-26, 50-51).  Therefore, DEA Special Agent Danya Johnson
("Special Agent Johnson") coordinated to have DEA agents located between
Birmingham, Alabama, and the Georgia state line to establish surveillance of the
trailer as it approached the state line, and they reached out to Georgia State Patrol
("GSP") for assistance and relayed to GSP Trooper Brandon Howerton ("Trooper
Howerton") the tag number for the trailer and all of the information they gathered
from their investigation, including that the DEA had a tracker on Andrew's trailer;
that they believed there would be a false wall inside the trailer; that they did not
believe there would be any cargo inside since the tracker data showed that it had not
stopped anywhere long enough between Texas and Atlanta to pick up a load; that
they believed there would either be cocaine or heroin in the trailer since it was
coming from Texas; and that they believed the red Volvo tractor agents observed
previously pulling the trailer would be pulling the trailer that day.  (Tr. at 11-12, 25-
27, 53, 57-59, 196).  Special Agent Johnson remained in contact with Trooper
Howerton, providing him with updates on the trailer's location and expected time
of arrival based on the tracker data.  (Tr. at 27-28).[10]

On March 13, 2018, Officer Kendall Stanley ("Officer Stanley"), of the Georgia
Department of Public Safety's Motor Carrier Compliance Division, was instructed

---

[10] Law enforcement could also access a DEA radio channel, which became
active as the trailer got closer to the Georgia state line.  (Tr. at 93-94).

to be in Haralson County at the Georgia-Alabama state line at approximately 2:30 or 3:00 a.m. to assist DEA.[11]  (Tr. at 98, 101, 128).  He was informed by Trooper Howerton, who was serving as the liaison between GSP and DEA that day, that a "tractor trailer [] was coming that was suspected to have a large load of narcotics in it and that usually the vehicle [was] empty or had a small load and it was suspected to have a front wall compartment in the trailer," along with a brief description of the tractor trailer, including that the tractor was red and that it had a Texas license plate. (Tr. at 101-03, 132-33).   At some point, Officer Stanley also had direct communications with DEA agents via the radio, and, at approximately 5:30 a.m., he overheard an agent comment that the tractor trailer was pulling into the Georgia Welcome Center and two males were observed in the vicinity of the tractor trailer taking turns going to the bathroom.  (Tr. at 29, 53-57, 102-03).  At that point, Officer Stanley, Trooper Howerton, and GSP Trooper Christopher Ramsey ("Trooper Ramsey") left the rest area where they had been waiting and proceeded about three or four miles down Interstate 20 to a cut-through in the woods to wait for the tractor

---

[11] Officer Stanley is not a GSP Trooper, but is detached to the GSP Criminal Interdiction Unit.  (Tr. at 98).  Officer Stanley has authority to stop and inspect commercial vehicles weighing more than ten thousand pounds, and he also has authority to make traffic violation stops of all types of vehicles.  (Tr. at 99, 129-30, 177-79, 188-90).  He testified that he has had extensive training related to commercial vehicle compliance and that he conducted approximately 280 inspections in the year prior to this stop.  (Tr. at 100-01).

trailer to start moving again, which occurred several hours later at about 9:00 a.m. (Tr. at 29, 57, 102-03, 134, 136).  DEA agents continued following the tractor trailer and providing updates over the radio, including which mile markers they were passing.  (Tr. at 103, 134-35).  As the tractor trailer got closer, Officer Stanley pulled out from the cut-through and waited on the side of the road and when the tractor trailer passed, he first verified over the radio that he had the correct tractor trailer,[12] and then proceeded to activate his lights and pull the tractor trailer over at approximately 9:30 a.m.  (Tr. at 53, 103-04, 136-37, 176-78).[13]

Officer Stanley approached the passenger side of the tractor, knocked on the door, and stepped up on to the running board.  (Tr. at 104-05, 140-41; Gov. Ex. 2a at 1:05).[14]  He introduced himself and told the driver, later identified as defendant Sakapala, that he had stopped him to perform an inspection.  (Tr. 104-05, 140-41; Gov. Ex. 2a at 1:05).  Officer Stanley asked Sakapala for his driver's license, and he

---

[12] The trailer attached to the tractor that Officer Stanley stopped was the same trailer agents had observed on February 13, 2018.  (Tr. at 16-17).

[13] The evidence at the hearing included a video recording depicting the stop in question.  See (Tr. at 124-25; Gov. Exs. 2a, 2b, & 3b).

[14] Officer Stanley testified that the "basis of the stop was for the vehicle inspection and . . . the information [he had] from the DEA," but acknowledged on cross-examination that if he did not "have any information from [the DEA], [he] would have still been at home in the bed" and would not "have been called out." (Tr. at 139).

produced a driver's license bearing the name "Edward Dittu." (Tr. at 105, 142; Gov. Ex. 2a at 1:36). Officer Stanley also asked him for the paperwork for the inspection, including logbooks, and Sakapala informed Officer Stanley that his electronic logbook, which was required by the federal motor carrier administration, had malfunctioned. (Tr. at 105; Gov. Ex. 2a). Instead, Sakapala produced paper logs, but despite the requirement that paper logs consist of the current day and the previous seven days, he only produced three carbon copied pages, consisting of the current day, the previous day, and a blank page. (Tr. at 105-06, 143-45, 153-54, 192-93; Gov. Ex. 2a at 2:53).[15]

Officer Stanley next asked Sakapala what he was doing on the trip, and Sakapala responded that he went to Tallapoosa, where the Welcome Center was located, to pick up the trailer that had been abandoned by someone who "had quit the company." (Tr. at 106, 148, 216; Gov. Ex. 2a at 3:41). Due to his prior knowledge of the investigation and the updates provided by the DEA, Officer Stanley knew that Sakapala's statements were not accurate. (Tr. at 106, 148). Sakapala also said that he did not know exactly where he was going or what he may be picking up, but that his destination was "the Petro," a truck stop that was a known "drug hot spot." (Tr.

---

[15] Officer Stanley testified that Sakapala seemed a "little nervous" when he handed over the documents, and his hands were shaking and he was "kind of talkative." (Tr. at 123-24, 165; Gov. Ex. 2a at 8:41).

at 116-17, 165; Gov. Ex. 2a at 5:24, 9:20).  Officer Stanley also asked Sakapala if he typically drove this tractor, and Sakapala responded that he did not, but Officer Stanley observed that there was a "Marine Corps license plate that[ was] zip-tied to the front" of the tractor, and while he was writing a number down, he asked Sakapala if he was in the Marine Corps, and Sakapala explained that his father was in the Marine Corps in reference to the license plate.  (Tr. at 107, 150, 160-61; Gov. Ex. 2a at 7:42, 10:38, 12:15).  Sakapala also told Officer Stanley that he was not transporting a load, but Officer Stanley observed that there was a padlock on the trailer, which, in his experience, was unusual if the trailer was empty.  (Tr. at 105, 107, 180; Gov. Ex. 2a at 11:03).  After Officer Stanley gathered all of the information for the inspection, he went back to his vehicle to enter the information into the "Aspen" system, which showed that "Edward Dittu" previously had been inspected in this tractor several times.  (Tr. at 108, 160; Gov. Ex. 2a at 8:51, 13:13, 15:22, 16:26).

Officer Stanley returned to the tractor and asked Sakapala to open the trailer in order to confirm he had no cargo, and Sakapala readily agreed, saying, "No problem," as Officer Stanley explained that he needed to confirm that Sakapala had not picked up an "odd ball" trailer with something in it, and Sakapala produced a key to the trailer and opened it, confirming that it was, in fact, empty.  (Tr. at 110, 161, 166-67, 190; Gov. Ex. 2a at 23:30, 24:01-25:33).  Officer Stanley then asked

Sakapala if "there was anything illegal," and Sakapala replied, "No, and he kind of made a motion like, you know, here it is[,] [y]ou can . . . look." (Tr. at 110; Gov. Ex. 2a at 25:59-26:19). Officer Stanley then asked Sakapala for consent to search the trailer, at which time Sakapala said, "Sure," and Officer Stanley then provided him with a consent to search form and asked him to read it and if he agreed, to sign it, but added that, if he did not agree, he did not have to sign it, and after briefly looking at the form, Sakapala signed it at the bottom in the name "Edward Dittu." (Tr. at 110-14, 162-63, 166; Gov. Ex. 1; Gov. Ex. 2a at 26:20-26:53).[16]

---

[16] In particular, the consent to search form signed by Sakapala provided in relevant part:

> I, EDWARD BONIPHACE DITTU, hereby grant my consent to MCO3 K. STANLEY RAMSEY HOWERTON Troopers of the [GSP] to search the following described vehicle, including luggage, containers, and contents of all. This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.
> . . .
> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to consent to the search described above or to sign this form.
>
> My consent is freely and voluntarily given.

(Tr. at 191; Gov. Ex.1). Sakapala signed the consent form at 9:45 a.m. (Id.). At the time Officer Stanley requested consent, he and Trooper Ramsey were the only officers present at the scene, but Trooper Howerton arrived on the scene soon after

After Sakapala signed the consent to search form, he stood on the side of the road with Trooper Howerton, and as Officer Stanley and Trooper Ramsey were about to begin the search, Sakapala informed them that he had a passenger in the sleeper area, who then emerged from the tractor; produced an identification, bearing the name of Banda; and stated that he was not the driver and that he was just along for the ride because he was thinking of getting his commercial driver's license.  (Tr. at 114-15, 166-69; Gov. Ex. 2a at 29:30-29:55, 30:56-32:45).[17]  Officer Stanley explained to Banda that Sakapala had consented to a search of the trailer and then asked him to exit the tractor and to stand with Sakapala and Trooper Howerton behind the trailer.  (Tr. at 115, 117, 198, 208; Gov. Ex. 2a at 32:47-33:20).[18]  Officer Stanley and Trooper Ramsey then proceeded to search the tractor trailer, and Officer Stanley first observed that the trailer was new and in very clean condition.  (Tr. at 117-18; Gov. Ex. 2a at 28:43).  He also observed handprints on the ceiling of the trailer and metal shavings on the floor near the front wall of the trailer; that there was a plywood

Sakapala signed the consent.  (Tr. at 114, 205-06, 215).

[17] Sakapala also added that Banda had been riding with the previous driver who quit and had been left behind with the trailer.  (Tr. at 216).  Officer Stanley testified that he did not realize there was a second person in the tractor trailer.  (Tr. at 181); see also (Gov. Ex. 2a at 30:22-30:29).

[18] During the search, neither defendant was placed in handcuffs or restrained in any way.  (Tr. at 117, 197, 200; Gov. Ex. 2a).

wall, which was common, but that there were handprint smudges on the plywood; that the screws in the front plywood wall were unevenly screwed in; that the caulking along the top of the front wall did not match the caulking on the other walls of the interior of the trailer; and that a metal plate on the floor near the front wall had some bolts that were backed out and painted over.  (Tr. at 118, 171-72, 191; Gov. Ex. 2a at 28:45, 33:27, 37:01-37:42, 45:30-48:17, 50:19-52:15).   Based on his observations, Officer Stanley believed that there was a concealed compartment behind the front plywood wall of the trailer, or, in other words, a "trap,"[19] and he retrieved his tools from his vehicle, walked past the defendants to return to the trailer carrying his tools, and removed a part of the plywood front wall of the trailer. (Tr. at 119-20, 122, 173; Gov. Ex. 2a at 52:58-55:45).   At this time, Officer Stanley observed a metal wall with an access panel, (Tr. at 120, 173-74), and defendants were then placed in handcuffs while Officer Stanley removed the access panel and subsequently retrieved suitcases and duffel bags from the compartment, which contained kilogram-sized bags of narcotics, later determined to be cocaine, (Tr. at

---

[19] Officer Stanley testified that "traps" are illegal in Georgia.  (Tr. at 122).

120-22, 174; Gov. Ex. 2a at 58:18-59:21).[20]  Thereafter, DEA was notified of the seizure and responded to the scene.  (Tr. at 30, 122).[21]

Trooper Ramsey transported defendants from the scene to the DEA office in Atlanta, Georgia, which took at least 30 minutes.[22]  (Tr. at 218-19; Gov. Ex. 3a). During the ride, Trooper Ramsey overheard part of the conversation between defendants, including that Sakapala said to Banda, "Man, they know."  (Tr. at 220-21, 227, 230-32, 235-37; Gov. Ex. 3a).  In addition, during the booking process at the DEA office, Banda asked Special Agent Sherezad Dunn ("Special Agent Dunn") what the charges were against him, and Special Agent Dunn advised him that it was conspiracy to traffic cocaine.  (Tr. at 240, 242-43).  Banda then replied that he "did

---

[20] At some point, GSP Corporal Michael Allen ("Corporal Allen") arrived on scene with a K-9 named Tesa, who was trained to detect narcotics.  (Tr. at 169, 181-82; Gov. Ex. 2a at 1:00:33).  Prior to removing the access panel, Corporal Allen deployed Tesa, but she did not alert.  (Tr. at 121, 174, 186; Gov. Ex. 2a at 1:00:33-1:11:30).

[21] At no time did Officer Stanley display his weapon, nor did he observe any other law enforcement officers brandish their weapons while on the scene.  (Tr. at 123, 200-01; Gov. Ex. 2a).  Likewise, Officer Stanley testified that he did not hear anyone threaten either defendant while on the scene, nor did anyone make them any promises.  (Tr. at 123; Gov. Ex. 2a).

[22] A video recording of defendants seated in the back seat of the patrol vehicle on the drive to the DEA office was admitted into evidence at the evidentiary hearing.  (Tr. at 218-19, 222, 227; Gov. Exs. 3a & 3b).

not know what [Special Agent Dunn] was talking about," but also commented that he "was screwed."  (Tr. at 240-41, 243-45).

At approximately 2:30 p.m. on March 13, 2018, Special Agent Johnson, along with Intelligence Analyst Gina Wright ("Wright") and Task Force Officer John Cheek, interviewed Sakapala at the Atlanta DEA office.  (Tr. at 30-31, 88-90).  During the interview, the door was closed, but cracked; Sakapala was not handcuffed; no one made physical contact with Sakapala; and no one was armed.  (Tr. at 31-34).  Special Agent Johnson first obtained biographical information from Sakapala, including name, date of birth, and address, and he then advised Sakapala of his Miranda[23] rights.  (Tr. at 32; Gov. Ex. 4).  Specifically, Agent Johnson advised Sakapala that he had the right to remain silent and that any statements he made could be used against him.  (Tr. at 32; Gov. Ex. 4).  He further advised Sakapala that he had the right to speak to an attorney, to have one present during the questioning, and to have one appointed for him if he could not afford one.  (Tr. at 32; Gov. Ex. 4).  Sakapala indicated that he understood his rights, and, at 2:42 p.m., he placed his initials beside each question on the pre-printed Miranda form and then read and signed the waiver of rights portion, which states:

---

[23] See Miranda v. Arizona, 384 U.S. 436 (1966).

19

I have read or someone has read to me this advice of rights and I
understand what my rights are.  At this time, I am willing to freely and
voluntarily answer questions without a lawyer present.

(Tr. at 32-33; Gov. Ex. 4).  Wright also signed the form as a witness.  (Tr. at 32; Gov.

Ex. 4).  After advising Sakapala of his rights, Special Agent Johnson asked him

various questions, and Sakapala proceeded to make certain incriminating

statements.  (Tr. at 90).  During the interview, no one made any threats or promises

in order to induce Sakapala to waive his rights and speak with the agents, nor did

anyone have any physical contact with him.  (Tr. at 33-34).[24]

## II. DISCUSSION

Defendants challenge the initial stop on March 13, 2018, as not supported by

probable cause or valid under the Georgia Department of Public Safety Motor

Carrier Compliance Enforcement Section, and therefore, contend that all evidence

and statements obtained as a result of the stop should be suppressed.  [Docs. 57 &

58].  Defendants also argue that Sakapala's consent to search the trailer was not valid

because it was the product of an illegal stop and not voluntary, and even if valid,

Officer Stanley exceeded the scope of the consent.  [Doc. 58 at 25-28].[25]  Finally,

---

[24] The interview was not recorded out of fear that Sakapala would "clam up,"
especially since they believed he was "going to cooperate."  (Tr. at 90-91).

[25] At the pretrial conference and the evidentiary hearing, the government
asserted that Banda lacked standing to challenge the search of the trailer, see [Doc.
38; Doc. 47 at 4-5], and Banda responded that he has standing under the Fourth

Banda moves to suppress the statement he made during the course of the booking process as immaterial, [id. at 29-30], and Sakapala seeks to suppress the statements he made while in the backseat of Trooper Ramsey's vehicle and at the DEA office as fruit of the poisonous tree, as well as, violative of his Miranda rights,[26] [Doc. 36; Doc. 57].  The Court will address each of these arguments.

---

Amendment to challenge the search for several reasons related to being a recent driver and passenger in the tractor, see [Doc. 42; Doc. 58 at 5-17].  The Court afforded Banda the opportunity to present evidence at the evidentiary hearing to support his standing to contest the search of the trailer, (Tr. at 3-8), but the record does not support finding that Banda had any reasonable expectation of privacy in the padlocked trailer, and the Court need not discuss his arguments about standing with respect to being a recent driver and passenger in the tractor because, even accepting that Banda has standing for the purposes of these pretrial motions, the stop, detention, and subsequent search were lawful, see United States v. Brounson, CRIMINAL CASE NO. 1:15-CR-00366-ELR-JFK, 2016 WL 4472983, at *5 (N.D. Ga. May 23, 2016), adopted by 2016 WL 4472971, at *1 (N.D. Ga. Aug. 23, 2016).

[26] In Sakapala's initial motion to suppress statements, [Doc. 36], he argued that he "was never properly advised of his Miranda Rights after he was in custody and prior to the interrogation by the authorities," [id. at 1].  In his post-hearing brief, Sakapala's sole argument for the suppression of statements is that they were obtained as a result of an unlawful seizure and therefore due to be suppressed as "fruit of the poison tree."  [Doc. 57 at 12 (internal marks omitted)].  While Sakapala may be deemed to have abandoned his argument that his statements were obtained in violation of his Miranda rights, see United States v. Duruoha, Criminal Case No. 1:10–CR–00343–CAP–RGV, 2010 WL 5055905, at *1 (N.D. Ga. Oct. 29, 2010), adopted by 2010 WL 5055791, at *1 (N.D. Ga. Dec. 6, 2010), the Court will nevertheless address this issue.

## A.   Validity of the Initial Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure." United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted). The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968).  Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1

(M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished).  Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."[27] Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); see also United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see also United States v. Kelly, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

The government maintains that Officer Stanley "had the statutory authority to stop the tractor trailer without reasonable articulable suspicion," since "defendants had consented to regulatory compliance inspections by operating a commercial vehicle in Georgia."  [Doc. 62 at 24].  The government also argues that

---

[27] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'"  United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003)).  Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  United States v. Sokolow, 490 U.S. 1, 7 (1989).

law enforcement had probable cause to stop and search the tractor trailer, and that "at a minimum, [they had] reasonable articulable suspicion to stop this tractor trailer." [Doc. 51 at 20 (citation omitted); Doc. 62 at 2-24]. Defendants contend that while O.C.G.A. § 35-2-101 authorizes inspections of commercial vehicles, "Officer Stanley's stop of Sakapala's truck had no connection to performing a legitimate safety inspection," but was "at the behest of the DEA to find evidence of drug smuggling," and that the "law prohibits the use of warrantless administrative searches, intended for a specific purpose, in this case public safety, to be used for an alternate exclusive purpose of collecting evidence of a crime, which [was] precisely what Officer Stanley was doing." [Doc. 57 at 1-2, 5]; see also [Doc. 58 at 17-20]. Alternatively, defendants contend that Officer Stanley lacked probable cause to stop the tractor trailer. [Doc. 57 at 7-12; Doc. 58 at 20-25]. While the parties spend a considerable amount of time arguing about whether Officer Stanley lawfully stopped the tractor trailer pursuant to statutory authority, the Court need not reach this issue as the Court finds that Officer Stanley had reasonable articulable suspicion to support the stop, independent of the statutory authority.[28]

---

[28] Defendants' reliance on United States v. Orozco, 858 F.3d 1204 (9th Cir. 2017), to contest the stop and search, see [Doc. 57 at 2-3], is misplaced because in that case, the government conceded that the officer did not have probable cause or reasonable suspicion to stop the vehicle and sought to justify the stop and subsequent search only under the statutory inspection authority, see Orozco, 858 F.3d at 1210 (explaining that the court would not "decide whether the [] troopers

As previously stated, "[p]robable cause is not required to justify an investigative stop; reasonable suspicion is sufficient."   United States v. Pineda-Zuniga, CRIMINAL CASE NUMBER: 1:16-CR-00323-2-LMM-JSA, 2017 WL 9477640, at *5 (N.D. Ga. Aug. 18, 2017), adopted by 2017 WL 4074785, at *3 (N.D. Ga. Sept. 14, 2017) (footnote and citations omitted).   "In deciding whether there is reasonable suspicion, the Court is to consider the collective knowledge of all law enforcement officers working together, to the extent they maintained at least a minimal level of communication during their investigation."   Id. (citing United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985)).   "Moreover, officers may use a tip to develop reasonable suspicion, so long as the tip exhibits sufficient indicia of reliability."   United States v. Diaz-Fonseca, No. CR 112-242, 2013 WL 3147903, at *8 (S.D. Ga. June 19, 2013), adopted at *1 (citation and internal marks omitted); see also Alabama v. White, 496 U.S. 325, 331 (1990) (finding reasonable suspicion for the stop due to the correlation of the defendant's actions with those predicted in the anonymous tip, even though law enforcement never observed any illegal activity prior to stopping the defendant); United States v. Baptiste, 388 F. App'x 876, 879-80 (11th Cir. 2010) (per curiam) (unpublished) (noting that an informant's tip that a truck would deliver a large shipment of marijuana to a specific location provided

had reasonable suspicion for the stop, because the U.S. Attorney waived this argument by failing to address it").

reasonable suspicion to support a stop, even though the truck that was stopped was a different color than that predicted by the informant).  "Also, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity, . . . even if such activity is seemingly innocuous to the ordinary citizen." United States v. North, CRIMINAL CASE NO. 1:16-CR-00309-WSD-JFK, 2017 WL 9473407, at *5 (N.D. Ga. Aug. 8, 2017), adopted by 2017 WL 3821854, at *6 (N.D. Ga. Sept. 1, 2017) (alterations in original) (citations and internal marks omitted).  Here, "the stop of [the tractor trailer] was justified by reasonable suspicion based on information obtained through the agents' collective investigation and surveillance." United States v. Goldenshtein, Criminal Case No. 1:10-CR-00323-TCB-RGV, 2011 WL 1321573, at *10 (N.D. Ga. Feb. 22, 2011), adopted by 2011 WL 1257147, at *1 (N.D. Ga. Apr. 1, 2011).

In particular, agents received information from a CS that "Andrew" was involved in trafficking narcotics from California and Texas to Atlanta, and the CS described the manner in which he did so, leading agents to perform database checks that revealed Andrew previously was investigated by the DEA in Atlanta as an individual suspected of transporting narcotics via tractor trailer.  (Tr. at 13, 34-37, 64, 69-71).  Agents then began conducting surveillance and observed activity consistent with the information provided by the CS, who was a member of Andrew's inner

circle.   (Tr. at 13, 34-37, 64, 69-71, 73-74).   Thereafter, DEA agents applied for and

obtained a court order for a geo-location warrant for Andrew's phone, and this geo-

location data demonstrated a pattern of activity, coupled with surveillance, that was

consistent with the information provided by the CS, including that Andrew traveled

from California to Atlanta on February 10, 2018, and was observed a few days later

at a warehouse where a tractor trailer was parked, and this trailer was the same one

that was stopped on March 13, 2018.  (Tr. at 14-18, 37-39, 42, 95).  Later, geo-location

data showed that Andrew traveled back to California and a license plate reader also

captured that the trailer was traveling toward California.   (Tr. at 18).   The CS

provided additional information to the agents, including that there were potentially

two tractor trailers containing narcotics coming to Atlanta, and a few days later,

Andrew traveled back to Atlanta, as did his trailer, and on February 27, 2018, agents

observed Andrew and the trailer at the same warehouse, as well as a second tractor

trailer, where unidentified men were seen carrying a ladder into the trailers and then

exiting the trailers with suit-case sized items, which was consistent with the CS's

information that Andrew used trailers with "traps" to transport the drugs.  (Tr. at

18-20, 44-45, 47, 59-60, 77-78, 95).  Thereafter, agents obtained a warrant and court

order to place a tracker on Andrew's trailer, and data from the tracker showed a

continued pattern of traveling to Texas and then back to Atlanta, with similar

activity occurring on March 5, 2018, of unidentified men taking a ladder into a trailer parked at the warehouse, and then a few days later, the trailer and Andrew's phone were back in Texas in the area of a warehouse used near the airport, and once again, the trailer headed back toward Atlanta on March 12, 2018. (Tr. at 19-26, 40-44, 48-51, 53).

Prior to the stop on March 13, 2018, Officer Stanley was briefed regarding the DEA's investigation, including the information provided by the CS and the pattern of activity that occurred on February 13, February 27, and March 4-5, 2018, and he knew that a specific tractor trailer was traveling from Texas with a suspected load of narcotics, that the trailer was usually empty, and that the drugs would likely be located in a compartment in the trailer behind the front wall, (Tr. at 11-12, 25-28, 53, 57-59, 101-04, 132-33, 159, 196), and these "facts provided a specific, concrete, and quite strong basis to conclude that criminal activity was afoot, and that [the tractor trailer] was transporting evidence," Pineda-Zuniga, 2017 WL 9477640, at *5; see also Diaz-Fonseca, 2013 WL 3147903, at *8, 11 (S.D. Ga. June 19, 2013) (finding law enforcement "had reasonable suspicion to stop the vehicle to investigate possible narcotics trafficking based on the information they had been given about [the vehicle] traveling eastbound on I-20 that was associated with a person by the name 'Fonseca' or 'Fonseco,'" who would occupy or otherwise be involved with the

vehicle).    Thus, the "stop was justified at least by reasonable suspicion." Pineda-Zuniga, 2017 WL 9477640, at *5 (footnote and citations omitted); see also United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (finding stop was based on reasonable suspicion since defendant was seen entering a house known to contain a marijuana growing operation and subsequently left with a garbage bag); United States v. Khan, CRIMINAL CASE NO. 1:17-CR-0040-SCJ, 2018 WL 2214813, at *7 (N.D. Ga. May 15, 2018) (citation omitted) (finding officers had probable cause to stop vehicle where "prior to the traffic stop of [d]efendant's car, [the] [t]rooper [] had been contacted by the DEA and was told that someone would be bringing Spice (synthetic marijuana); that on the date in question, [he] was on stand-by at the DEA's request; that [he] had a DEA radio mounted in his car; that the DEA was communicating with [him] by radio on the day of the [d]efendant's traffic stop; and that [he] knew what was happening via the updates over the DEA radio").  Accordingly, Officer Stanley had, at a minimum, reasonable suspicion to stop the tractor trailer on March 13, 2018.[29]  See United States v. Patton, Case No. 15-20246, 2018 WL 3370545, at *7 (E.D. Mich. July 10, 2018) (finding that the "DEA

---

[29] In fact, the agents had established probable cause to obtain a tracker for the trailer.  See United States v. Senese, Case No. 18-cr-60076-BB, 2018 WL 3159733, at *7 (S.D. Fla. June 28, 2018); see also United States v. Gibson, 708 F.3d 1256, 1278 (11th Cir. 2013) (citation and internal marks omitted) ("To obtain a warrant, police must establish probable cause to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

had at least reasonable suspicion to stop and search the vehicle, based on the reliability of the confidential informant, the level of detail provided by the informant, and the independent corroboration of the tip," which included electronic surveillance and geo-location information pertaining to a phone).

Where an officer initiates a legal stop, he has "the duty to investigate suspicious circumstances that then [come] to his attention." United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted). Indeed, "a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted). Moreover, an officer may as a matter of course order the driver of a lawfully stopped vehicle to exit his vehicle. See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977); United States v. Rodriguez, Criminal Case No. 1:10–CR–0407–TWT–JFK–3, 2011 WL 5191805, at *10 (N.D. Ga. Sept. 23, 2011), adopted by 2011 WL 5191798, at *1 (N.D. Ga. Oct. 31, 2011) (citations omitted); United States v. Espinal, Criminal Case No. 1:11–cr–00060–ODE–RGV, 2011 WL 7004195, at *9 n.12 (N.D. Ga. Aug. 29, 2011),

adopted by 2012 WL 92451, at *3 (N.D. Ga. Jan. 10, 2012) (citation omitted).   In addition, "[a]n officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check." Edenilson-Reyes, 2010 WL 5620439, at *10 (citation omitted).  "The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong[] beyond the time reasonably required to complete that mission." Cantu, 227 F. App'x at 785 (citation and internal marks omitted).  "When examining the reasonableness of a traffic stop, the length of time before consent is given to search is also relevant." Garcia, 284 F. App'x at 794 (citation omitted).

Officer Stanley had reasonable suspicion to stop the tractor trailer, and to prolong the stop as a result of the "suspicious circumstances that then [came] to his attention." Cantu, 227 F. App'x at 785 (citation and internal marks omitted); see also United States v. Rendon, 462 F. App'x 923, 926 (11th Cir. 2012) (unpublished). Specifically, Officer Stanley testified that after he approached Sakapala, explained to him that the reason for the stop was to perform an inspection, obtained his driver's license and logbook, and inquired as to his travel plans, see United States v. Ellis, 497 F.3d 606, 614 n.1 (6th Cir. 2007) (citation and internal marks omitted) ("It is well established that an officer is free to ask traffic-related questions, and

questions about a driver's identity, business and his travel plans during the course

of a traffic stop."), Sakapala provided responses that were vague and inconsistent

with the information that had been provided to Officer Stanley regarding the DEA

investigation, (Tr. at 105-06, 116-17, 143-45, 148, 153-54, 165, 192-93, 216).

Additionally, as Officer Stanley was completing the inspection paperwork, Sakapala

informed Officer Stanley that he did not normally drive that tractor trailer, yet he

had a Marine Corps tag on the front of the tractor and said that his father was in the

Marine Corps, and a database check showed that Dittu, the name on the driver's

license Sakapala provided, previously had been inspected in the tractor trailer

several times.  (Tr. at 107-08, 150, 160-61).  Officer Stanley further observed that the

trailer was padlocked, which, in his experience, was not normal for an empty trailer.

(Tr. at 105, 107, 180).  Therefore, Officer Stanley had "specific and articulable facts

which, taken together with rational inferences from those facts, reasonably

warrant[ed] the investigatory detention," and he was thus justified in prolonging the

stop.[30] United States v. Richardson, No. CR 108–151, 2009 WL 668706, at *3 (S.D. Ga.

---

[30] Although Sakapala maintains that "no safety inspection was done by Officer
Stanley after stopping [him]," but that he simply reviewed "his license and log
book" and then "immediately initiated the process that lead to a search of the truck
on behalf of the DEA," [Doc. 57 at 4], the video recording of the stop shows that
Officer Stanley promptly asked for Sakapala's logbook after stopping him and
discovered that it was not compliant with the federal motor carrier administration
requirements, and he continued to complete his inspection paperwork before
returning to his vehicle to enter the information into the "Aspen" computer system,

32

Mar. 12, 2009), adopted at *1 (citations omitted); see also United States v. Acosta, 807 F. Supp. 2d 1154, 1198-99 (N.D. Ga. 2011) (finding officer's stop of tractor trailer and subsequent request for consent to search was based on reasonable suspicion where the FBI had advised him that as part of an investigation into drug trafficking, they believed a load of narcotics was coming to Atlanta in a tractor trailer; that the FBI pointed out the tractor trailer as the one suspected of transporting narcotics; and that after the stop, the paperwork "was vague," among other things); United States v. Garcia-Aleman, No. 1:10-CR-29, 2010 WL 2635071, at *1 (E.D. Tex. June 9, 2010), adopted by 2010 WL 2635073, at *1 (E.D. Tex. June 30, 2010) (citations omitted) ("[I]f

_____

(Tr. at 105-06, 108, 143-45, 153-54, 160, 192-93; Gov. Ex. 2a). Since reasonable suspicion justified Officer Stanley's stop of the tractor trailer, he lawfully exercised his administrative inspection authority during the stop, see United States v. Longoria, INDICTMENT NO. 1:07-CR-149-CAP/AJB, 2008 WL 11440513, at *16 & n.26 (N.D. Ga. Mar. 10, 2008), adopted by 2008 WL 11440525, at *1 (N.D. Ga. Apr. 28, 2008), which included "the power to examine . . . the books and records of motor carriers for purposes of determining compliance with laws, the administration or enforcement of which is the responsibility of the department," O.C.G.A. § 35-2-101(c)(4), and to "enter upon, and inspect all motor vehicles using the public highways for purposes of determining whether such vehicles have complied with and are complying with laws, the administration or enforcement of which is the responsibility of the department," O.C.G.A. § 35-2-101(c)(3). Moreover, since the statute authorizes "law enforcement officers of the Motor Carrier Compliance Division to make use of dogs trained for the purpose of detection of drugs and controlled substances while such officers are engaged in the performance of their authorized duties," O.C.G.A. § 35-2-101(d), the fact that Officer Stanley had reasonable suspicion that the trailer was being used to transport drugs as he pursued his inspection did not invalidate his statutory authority, Longoria, 2008 WL 11440513, at *16 n.26 (citations omitted) ("[A]n administrative search is not rendered invalid because it is accompanied by some suspicion of wrongdoing.").

additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed."). In fact, "the brief detention was a reasonable response to the totality of the circumstances," Ellis, 497 F.3d at 614, and Officer Stanley "diligently pursued a means of investigation that was likely to confirm or dispel his suspicions as quickly as possible," United States v. Johnson, No. CR05-4063-MWB, 2005 WL 2704892, at *6 (N.D. Iowa Oct. 20, 2005). In short, the stop was not unreasonable under these circumstances. See United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (per curiam) (finding seventy-five minute Terry stop reasonable); United States v. Cooper, 873 F.2d 269, 275 (11th Cir. 1989) (per curiam) (finding thirty-five minute reasonable suspicion detention reasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (finding Terry stop lasting almost fifty minutes reasonable).

**B.     Consent to Search**

The subsequent search of the tractor trailer was lawful pursuant to Sakapala's voluntary consent.[31] "One of the well-established exceptions to the probable cause

---

[31] The government contends that Officer Stanley's observations and interactions with Sakapala during the stop "generated additional probable cause," [Doc. 51 at 20], to support the warrantless search of the vehicle, [id. at 21]. However, since the Court finds that Sakapala provided a valid consent to search the tractor trailer, it need not reach this argument.

and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citation omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Emanuel, 440 F. App'x 881, 883-84 (11th Cir. 2011) (per curiam) (unpublished); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007).  "An officer conducting a routine traffic stop may request consent to search the vehicle." United States v. Lamela-Cardenas, Criminal Action No. 1:11–00122–KD–C, 2011 WL 3494562, at *5 (S.D. Ala. Aug. 10, 2011) (citations omitted).  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360 (citation omitted); see also United States v. Crump, Criminal Action File No. 4:10–CR–032–HLM–WEJ, 2011 WL 6153106, at *6 (N.D. Ga. Nov. 21, 2011), adopted by 2011 WL 6179211, at *8 (N.D. Ga. Dec. 12, 2011); United States v. Teague. No. 2:10–CR–006–RWS–SSC, 2010 WL 6529640, at *19 (N.D. Ga. Nov. 12, 2010), adopted by 2011 WL 1497876, at *1 (N.D. Ga. Apr. 19, 2011).

The government bears the burden of proving that consent was voluntary, United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances, see Schneckloth, 412 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337.  Relevant factors

include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  Purcell, 236 F.3d at 1281.

Sakapala, as the driver of the vehicle, had authority to consent to a search of the vehicle.  See United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999). Therefore, defendants' "argument on this point must be rejected if either [Sakapala] or [Banda] voluntarily consented to the search of the [vehicle]." Id.  The evidence presented at the hearing shows that Officer Stanley, who was unaware of Banda's presence in the tractor, asked Sakapla to open the trailer to confirm he had no cargo, and Sakapala readily agreed, saying, "No problem," as Officer Stanley explained that he needed to confirm that Sakapala had not picked up an "odd ball" trailer with something in it.[32]  (Tr. at 110, 161, 166-67, 190; Gov. Ex. 2a at 23:30, 24:01-25:33). After seeing that the trailer was empty, Officer Stanley inquired whether there was anything illegal inside and asked for consent to search the trailer, and Sakapala

---

[32] As previously noted, following his lawful stop of the tractor trailer based on reasonable suspicion, Officer Stanley had "the power to . . . enter upon, and inspect" the tractor trailer as it was "using the public highways for purposes of determining whether [it had] complied with and [was] complying with laws, the administration or enforcement of which is the responsibility of the department." O.C.G.A. § 35-2-101(c)(3); see also Longoria, 2008 WL 11440513, at *18 (noting that a request for documents and to open a trailer for inspection were "all powers the legislative enactments authorize[d] during an administrative inspection").

readily gave an unequivocal, general consent as evidenced by the video recording, which shows him cooperating and speaking with Officer Stanley in a conversational tone in English, and Officer Stanley then presented a consent to search form and asked him to read it and sign it if he agreed, but added that did not have to sign it, and Sakapala signed the form.  (Tr. at 110-14, 162-63, 166, 191; Gov. Ex. 1).  Thus, Officer Stanley did not need Banda's consent prior to searching the tractor trailer.[33]

Defendants argue that Officer Stanley's "intrusion into the compartment beyond the plywood wall (e.g. 'trap') exceeded the scope of [] Sakapala's consent." [Doc. 58 at 27].  "When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless." United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992) (internal marks omitted) (quoting United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991)).  "Rather, it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." Id. (internal marks omitted) (quoting Harris, 928 F.2d at 1117).  In this case, Sakapala gave a generalized consent to search the tractor trailer, and though defendants argue that they believed the "purpose of the search was to verify that there was indeed no cargo in the trailer" and that Officer

---

[33] Additionally, "once [Sakapala] gave [Officer Stanley] consent to search [the tractor trailer], he also provided consent to prolong the traffic stop." Lamela-Cardenas, 2011 WL 3494562, at *7 (citation omitted).

Stanley "did not, at any point, express to [] Sakapala that his search pertained to narcotics," [Doc. 58 at 26], the evidence in the record shows that Officer Stanley did not exceed the scope of the Sakapala's consent.

First, Officer Stanley asked Sakapala for consent to search the tractor trailer after confirming that the trailer was empty and after asking whether there was anything illegal inside, and in this context, Officer Stanley's request for general permission to search the tractor trailer would be understood as a request to search the empty trailer for anything illegal, including in those areas where contraband may not be readily visible.  (Tr. at 110-14, 161-63, 166-67, 190).  Second, Officer Stanley presented to Sakapala a written consent form that clearly stated he was requesting consent for "Troopers of the [GSP]" to search the tractor trailer, "including luggage, containers, and contents of all," as well as the "removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband." (Tr. at 191; Gov. Ex. 1).  After being presented the form and provided the opportunity to read it and told he had the option to either sign it or not, Sakapala signed the consent form.  (Tr. 110-14, 162-63, 166; Gov. Ex. 1; Gov. Ex. 2a at 26:20-26:53).  Thus, as the government contends, "[r]emoving the plywood at the front of the trailer was well within the bounds of Sakapala's written consent." [Doc. 62 at 23].  Finally, both

defendants were present during the entire search and observed as law enforcement searched the trailer, including the fact that Officer Stanley walked by both defendants after retrieving his tools from his patrol vehicle and entered the trailer. (Tr. at 119-20, 122, 173); see United States v. Street, 472 F.3d 1298, 1308-09 (11th Cir. 2006) (citation omitted) (Where defendant signed an FBI consent to search form and "[n]owhere in or on the form he signed did [defendant] indicate a desire to restrict the search[] [n]or did he otherwise indicate to the agents that he wanted to exclude any property from the scope of the search[,] [t]he agents' belief that the police radio, in plain view on the bedroom floor, was within the scope of the consent was reasonable."); United States v. Ramirez-Chilel, 289 F.3d 744, 752-53 (11th Cir. 2002). If Sakapala intended the scope of his consent to be limited, he had ample opportunity to object or clarify, especially in light of the tone of communications he had with law enforcement before and during the search. See Street, 472 F.3d at 1308-09; United States v. Lima-Suarez, No. 1:05CR40-SPM, 2006 WL 763426, at *5 (N.D. Fla. Mar. 23, 2006). Consequently, Officer Stanley did not exceed the scope of Sakapala's consent in this case.

Defendants argue that Sakapala's consent to search the tractor trailer was not voluntary because "[a]t the point when [Officer] Stanley asked [] Sakapala for his consent to search, two additional armed police officers . . . arrived on the scene,

thereby causing [] Sakapala to succumb to the overwhelming display of authority"
and that during the "course of the initial search to verify the non-existence of cargo
in the trailer, yet another officer arrived," resulting in "four armed officers [] on site,
including a K-9 that was patrolling around and inside the trailer." [Doc. 58 at 27-28].
Defendants therefore assert that "[u]nder these circumstances, it is difficult to
imagine that a reasonable person would feel confident to exercise their right to either
revoke consent or refuse [Officer] Stanley's determination to expand the scope of the
search by retrieving his tools and dismantling the trailer." [Id. at 28]. The evidence
in this case, however, refutes defendants' arguments.

In particular, only Officer Stanley and one other officer were present at the
scene when Officer Stanley requested consent, and neither officer drew their
weapon, made any threats or displayed or used any force, and in fact, they had no
physical contact with either defendant at all.[34]  (Tr. at 200-01; Gov. Ex. 2a); see also
Edenilson-Reyes, 2010 WL 5620439, at *14 (finding presence of three officers did not
render consent involuntary).  In addition, the length of detention prior to the
consent, which was about 26 minutes, see (Gov. Ex. 2a at 26:22), "was not
extraordinary" and "did not effect the voluntariness of the consent," Edenilson-

---

[34] One other officer arrived on the scene immediately after Sakapala gave his
consent to search the trailer, (Gov. Ex. 2a at 27:28), and the K-9 officer arrived on the
scene about an hour into the traffic stop, after the consent search was under way,
(Gov. Ex. 2a at 1:00:33).

Reyes, 2010 WL 5620439, at *13 (citing United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished)) (finding "the 30 minutes prior to [] obtaining the consent was not extraordinary . . . [and] the length of the stop did not effect the voluntariness of the consent").  From the moment Officer Stanley began interacting with Sakapala and later, Banda, he communicated in a conversational, non-threatening tone and never touched either defendant or made any show of force prior to obtaining consent to search the trailer.  See (Gov. Ex. 2a).  Both of the defendants were cooperative during the stop, and  neither defendant voiced any objections during the search, nor did they rescind the consent in any way.  See (id.).  Thus, "[t]he Court easily concludes that [Sakapala's] consent was voluntarily given and was not the result of coercion, either expressed or implied."  United States v. Suarez, 694 F. Supp. 926, 940 (S.D. Ga. 1988), aff'd, 885 F.2d 1574 (11th Cir. 1989) (per curiam).

Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that Sakapala freely and voluntarily consented to a search of the tractor trailer.  See Brown, 223 F. App'x at 880 (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir.

1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gunpoint); <u>Garcia</u>, 890 F.2d at 360-61 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers' refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search); <u>United States v. Espinosa-Orlando</u>, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint by four agents, forced to lie on the ground near the roadway, and provided consent while one officer had his weapon drawn).  Accordingly, defendants' motions to suppress the evidence, [Docs. 33 & 35], are due to be denied.

**C.    Statements**

Defendants move to suppress any statements they made following their arrest.  <u>See</u> [Docs. 34, 35, & 36; Doc. 58 at 29].  Banda argues that his statement made to Special Agent Dunn during the booking should be suppressed as "not indicative of guilt specific to the presence of cocaine in the trailer," but "merely remarked on the status of his circumstances at that specific time."  [Doc. 58 at 29].[35]  With regard

_____

[35] Banda also asserts that the government has conceded that the only custodial statement it will seek to introduce is what he said during the booking process and that the government therefore has agreed not to introduce any other statements he made, including those "made roadside during the stop and search of the trailer."

to Sakapala's statements, he initially moved to suppress his statements, arguing that "he was never properly advised of his Miranda Rights after he was in custody and prior to the interrogation by the authorities." [Doc. 36 at 1]. In his post-hearing brief, Sakapala offers no arguments regarding his post-arrest statements, except that they should be suppressed as "'fruit of the poison tree.'" [Doc. 57 at 12]. However, there was no prior constitutional violation preceding Sakapala's post-arrest statements in this case because defendants were lawfully stopped and questioned during an investigatory detention based on reasonable suspicion and its scope and duration were reasonable. Accordingly, Sakapala's argument in this regard is without merit, and his motion to suppress his statements as fruit of his illegal detention is due to be denied. Nevertheless, to the extent Sakapala maintains a challenge to his post-arrest statements and waiver of his rights independent of any

---

[Doc. 58 at 29]. In response, the government points out that the only statement Banda made while in custody was the statement made during the booking process and that the statements made roadside during the stop and search were non-custodial and it has not conceded that it would not seek to introduce these statements. See [Doc. 62 at 27]. The government also points out, see [id.], that Banda only challenged these additional non-custodial statements as "fruits that flowed from [the] unconstitutional encounter," [Doc. 35 at 3 (citation omitted)]. Having already found that defendants were lawfully stopped and detained on March 13, 2018, and because defendants have advanced no arguments for suppressing any pre-arrest statements by either of them, their argument is without merit.

fruit of the poisonous tree argument, the Court will address the circumstances surrounding both defendants' post-arrest statements.

"Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights to remain silent and to the presence of retained or appointed counsel during questioning." United States v. Martin, No. 1:14–CR–00427–ELR, 2015 WL 4664889, at *12 (N.D. Ga. Aug. 6, 2015), adopted at *5 (citation omitted). "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" United States v. de los Santos, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007), adopted at *2 (citation and internal marks omitted); see also Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (citation omitted) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action."). Thus, "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).[36]

---

[36] In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the

However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'" United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). Thus, the "special procedural safeguards outlined in *Miranda* are required . . . where a suspect in custody is subjected to interrogation," which "must reflect a measure of compulsion above and beyond that inherent in custody itself." Innis, 446 U.S. at 300 (footnote omitted). Defendants bear the burden of establishing that they were in custody and that their statements were made in response to government questioning. See United States v. de la Fuente, 548

---

individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 467-70. Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

F.2d 528, 533 (5th Cir. 1977).[37]   The government bears the burden of proving that defendants' statements were voluntarily given.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).  Here, it is uncontested that both defendants were in custody at the time of their post-arrest statements.  Thus, the issues to be addressed are whether Banda's post-arrest statement made during the booking process on March 13, 2018, was the product of interrogation, and whether Sakapala's post-arrest statements during his interview on the same day, which the government concedes were the product of interrogation, were freely and voluntarily made after Sakapala knowingly, intelligently, and voluntarily waived his rights.

    **1.**    *Banda's Statement*

Following Banda's arrest and during the booking process on March 13, 2018, Banda inquired what the charges were against him, and Special Agent Dunn advised him that he was being charged with conspiracy to traffic cocaine.  (Tr. at 240, 242-43).  Banda then replied that he "did not know what [Special Agent Dunn] was talking about," but also commented that he "was screwed."  (Tr. at 240-41, 243-

---

[37] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

45).   Banda moves to suppress his statement, since it "does not amount to a confession[.]"   [Doc. 58 at 30].

The Supreme Court has defined the "functional equivalent" of interrogation as "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"   United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (alteration in original) (quoting Innis, 446 U.S. at 300-01).   "In determining whether an exchange was the functional equivalent of an interrogation, the focus of the inquiry is the perception of the suspect, not the intent of the police."   United States v. Suarez, 162 F. App'x 897, 901 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).   Here, there is no indication that Special Agent Dunn engaged in any action that she should have known would be "reasonably likely to elicit an incriminating response" from Banda. Indeed, the record establishes that Banda initiated the conversation with Special Agent Dunn by asking about his charges, and after she answered his question, he made a spontaneous, voluntary statement, "without any compelling influences" from Special Agent Dunn.   See   Innis, 446 U.S. at 299-300; see also United States v. Harkness, 305 F. App'x 578, 583-84 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted).   Absent evidence that Banda's statement during the booking

process was the product of interrogation or its functional equivalent, it is not subject to suppression.[38] See United States v. Jules, 244 F. App'x 964, 972-73 (11th Cir. 2007) (per curiam) (unpublished); see also United States v. Avellaneda-Dimas, CRIMINAL NO.: 1:17-CR-338-ELR-JSA, 2018 WL 4558911, at *9 n.2 (N.D. Ga. July 24, 2018), adopted by 2018 WL 4558196, at *1 (N.D. Ga. Sept. 21, 2018).

### 2. *Sakapala's Statements*

Sakapala moved to suppress the post-arrest statements he made to Special Agent Johnson after he was taken into an interview room at the Atlanta DEA office. [Doc. 36].[39] It is undisputed that Sakapala was subjected to custodial interrogation by Special Agent Johnson after he was informed of his Miranda rights and agreed to waive them. See (Tr. at 32; Gov. Ex. 4). To the extent Sakapala maintains that his

---

[38] Banda's argument about the relevance of his statement is not a basis for suppression of the statement, but may be raised at trial.

[39] While defendants were seated in the backseat of Trooper Ramsey's vehicle being transported to the DEA office in Atlanta, Trooper Ramsey overheard Sakapala make a statement to Banda to the effect of, "man, they know." (Tr. at 220-21, 227, 230-32, 235-37). Sakapala has not specifically moved to suppress this statement, but even if he had, it would fail for the same reasons as the statement made by Banda during the booking process because it was not the product of interrogation, and "[a]s *Miranda* itself recognized, . . . [v]olunteered statements of any kind are not barred by the Fifth Amendment and, thus, do not require preliminary advice of rights." United States v. Hicks, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008), adopted at 1379 (third alteration in original) (citations and internal marks omitted).

waiver was the product of coercion rather than a free and deliberate choice, the

Court disagrees.

A defendant may waive his rights if the waiver is made voluntarily,

knowingly, and intelligently.  Miranda, 384 U.S. at 444.  The government bears the

burden of proving by a preponderance of the evidence that defendant validly

waived his Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir.

1997) (citation omitted); see also Connelly, 479 U.S. at 168 (citations omitted).  This

inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception.  Second, the waiver must have
> been made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it.  Only
> if the "totality of the circumstances surrounding the interrogation"
> reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the Miranda rights
> have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at

*3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d

580, 585 (11th Cir. 1995));  see also Moran v. Burbine, 475 U.S. 412, 421 (1986);

Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725

(1979); Schneckloth, 412 U.S. at 226.  The voluntariness analysis often depends on

whether "the defendant's will was overborne."  Lynumn v. Illinois, 372 U.S. 528, 534

(1963) (citations omitted).  Thus, to find that a waiver was involuntary, "coercive

police activity is a necessary predicate." <u>Connelly</u>, 479 U.S. at 167; <u>see also</u> <u>Moran</u>, 475 U.S. at 421 (relinquishment of <u>Miranda</u> right must be the product of free and deliberate choice rather than intimidation, coercion, or deception). "Therefore, in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." <u>United States v. Stevenson</u>, Criminal Case No. 1:11–cr–00350–ODE–RGV, 2012 WL 1424169, at *8 (N.D. Ga. Mar. 7, 2012), adopted by 2012 WL 1418635, at *5 (N.D. Ga. Apr. 23, 2012) (citation and internal marks omitted).

A valid waiver, however, "requires more than just a finding of voluntariness"; it "must also be knowing and intelligent." <u>Id.</u> (citation and internal marks omitted). "In contrast to a finding of voluntariness, the court need not find coercion in order to find a defendant's waiver unknowing or unintelligent." <u>United States v. Harrold</u>, 679 F. Supp. 2d 1336, 1350 (N.D. Ga. 2009), adopted at 1338 (citation and internal marks omitted). "No single factor is necessarily determinative of the issue of whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." <u>Patterson</u>, 2007 WL 2331080, at *3 (citation omitted). "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a requisite level of comprehension." <u>Harrold</u>, 679 F. Supp. 2d at 1350 (alteration in original) (citation and internal marks

omitted).  "However, an express oral or written waiver of *Miranda* is strong proof of the validity of the waiver."  Id. (citation omitted) (citing United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002)).

The totality of the circumstances in this case indicate that Sakapala knowingly, intelligently, and voluntarily waived his rights after Special Agent Johnson recited them to him.  (Tr. at 32; Gov. Ex. 4).  Sakapala was simply not coerced, intimidated, or deceived by any of the law enforcement officers present in the interview room, and there is no evidence that Special Agent Johnson made any promises or inducements to obtain a waiver.  (Tr. at 31-34).  After Special Agent Johnson recited to Sakapala the Miranda warnings from the form, Sakapala signed the form, acknowledging that he understood his rights and was still willing to answer questions.  (Tr. at 32-33; Gov. Ex 4).  In short, there is simply no evidence that law enforcement took any actions subsequent to Sakapala's arrest that would have caused him to feel coerced.  Indeed, Sakapala was not physically restrained during the interview, none of the agents present were armed, no one made physical contact with Sakapala, and no one made any threats or promises to him to induce him to waive his rights and speak with the agents.  (Tr. at 31-34); see also United States v. Calles, 271 F. App'x 931, 939 (11th Cir. 2008) (per curiam) (unpublished); United States v. Harris, 151 F. App'x 882, 886 (11th Cir. 2005) (per curiam) (unpublished).

Moreover, the video recording of the traffic stop that same day shows that Sakapala had no apparent difficulty communicating in English, appeared to understand the questions asked of him and provided responsive answers, and did not appear to be under the influence of alcohol or drugs. (Gov. Ex. 2a). Thus, Sakapala's waiver was the "product of a free and deliberate choice," and he voluntarily, knowingly, and intelligently waived his rights. Moran, 475 U.S. at 421. Accordingly, the totality of the circumstances surrounding the interrogation demonstrates that Sakapala was clearly advised of his rights, and he voluntarily, knowingly, and intelligently waived them. Patterson, 2007 WL 2331080, at *3-4. Furthermore, there is no basis for concluding that the entire sequence of events brought about an involuntary confession. Sakapala's post-Miranda statements on March 13, 2018, are therefore not due to be suppressed.

## III.  CONCLUSION

For the foregoing reasons and cited authority, Sakapala's motion to adopt, [Doc. 61], is **GRANTED**, and it is hereby **RECOMMENDED** that defendants' motions to suppress evidence and statements, [Docs. 33, 34, 35, & 36], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 30th day of January, 2019.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE